May it please the court, I am Eric Freitas, the counsel for the appellants, the Carlson family. It is our contention that the ALJ's decision and the district court's decision was in violation of four very distinct cases that this court has ruled upon, and four concepts. One, an IEP is judged based on what was reasonably known at the time of the IEP meeting when the IEP was developed. It is not looked back in hindsight, it's a snapshot. That is from this court's decision in Adams v. Oregon. Secondly, Union v. Smith says that an offer has to be clear, specific, formal, written, so that the parents can identify what is being offered to them. Third is the parents have a right to participate in all steps in the development of the IEP. And in particular, in this court's decision in Shapiro, for example, when the parents are not present and there is a change made either to the IEP or the IEP is developed, that is a denial of the parents' right to participate, merely because they were denied the opportunity to ask questions. In 2006, the IEP team and the parents developed an IEP. According to testimony and statements introduced at the hearing, four district witnesses that participated at the IEP meeting all agreed that the district decided not to address this child's sensory deficits, on the grounds that while the child had sensory deficits, the deficits were not affecting their education. This was contrary to what the parents and their experts contended. That was the district's decision. As a result, there was no discussion of sensory deficits other than the decision that we're not going to address it, we're not putting it into the IEP. The district occupational therapist said we're relying on the private occupational therapist to deal with that, because those are non-educational issues. Now, that occurred in September 2006. For the next 18 months, while there were opportunities for more IEP meetings, there were resolution sessions as part of the due process, there were pleadings, etc., etc., and right up through three and a half days of hearing, the district maintained its decision that the sensory deficits were not affecting education, and therefore its decision to not include that in the IEP was justified. Council's opening statement in the hearing was, as obligated, the district's program addressed those needs which were adversely affecting students' educational performance. The district staff did not believe students had any sensory issues which were impacting her educational performance. I'll note for the record that I took out the child's name and I put in the word student. Now, at what point did the advisor to the parents say there may be some sensory problems? As early as July of 2006, and the speech pathologist, the tutor who was a master's in special ed, the vision therapist, and the occupational therapist, excuse me, not the occupational therapist, all actually participated in these meetings and pointed out effects that they believed the sensory deficits were having on the student, and the district said, we just don't see that in the classrooms, and we're not going to address that. Now, it turned out during the hearing that they actually identified conduct of the student which they didn't realize were sensory deficits, and that was pointed out during the hearing, and we believe that is why they changed their defense right during the hearing, when they realized, oh my gosh, there were things going on. Now, on the last day of the hearing, by the way, the first three days we spent proving the sensory deficits were affecting the child's education. On the last day, the occupational therapist who said at the meeting it's not affecting her education, and therefore we're not going to address it, said it is affecting her education. Well, time for celebration. They've just admitted that which we've been trying to prove for the past 18 months, but then a strange thing happened. The occupational therapist, Mejia, also said, contrary to saying at the IEP meeting we're not going to address it, he looked at the document and said, well, there are things in the document that address sensory deficits, pointing to reading goals and writing goals and adaptive physical education goals. The position made so little sense, because it was contrary to every bit of testimony in the case, including his own statements at the IEP meeting, that we certainly expected the ALJ to apply common sense and say, wait a minute, you said one thing back then, now you're telling me another thing? Uh-uh, I don't buy it. Well, isn't it possible or conceivable that the steps that they had identified that were necessary for the IEP did in fact address the sensory concerns, although they might have not been placed there for that purpose, they actually did? Well, yes, and that's why the thrust of our argument to the Court of Appeals and to the district court below was, even if you conclude that the document did address those needs, the parents, because they were told at the time of the IEP meeting that the district was not addressing those needs, were denied any opportunity whatsoever to ask, well, how is that addressing the needs? Who's going to be doing it? For example, the hearing officer found a big portion of what she said met the needs was that the adaptive PE teacher was going to be doing things that address sensory. Well, that's very interesting, except that she ignored the testimony of the APE teacher, Kababa, Tracy Kababa, who said, well, I knew kind of what sensory deficits were, we talked about it a little in school, but I was not intending to address sensory deficits. I didn't write my goals with the intent to address sensory deficits. I wasn't working with the occupational therapist. The issue was whether what they put in the IEP could have addressed sensory deficits without saying so, and the parents certainly and their experts were vigorous participants in the meeting to formulate the IEP. Yes. I'm not sure. What were they denied? They were denied the opportunity to, the IEP process is a number of things. You assess to determine the deficit, you determine whether or not there is an effect on education, and you go from there and you say, okay, how are we going to deal with that deficit? What services? What goals? How often? Who's going to do it? Where are we going to put this? This wasn't the first IEP. Well, there were two IEPs that we're dealing with, which I've combined into one, September 13th and September 23rd. There were prior IEPs. There were prior IEPs. And there's a record. Yes. I don't understand the question. No, I'm just. Yes. It's an ongoing. Yes, there was. And it was only when a tutor became involved and said to the parents, this girl is not progressing. I think she's got sensory deficits, that the parents explored it further. The district had this girl classified as mentally retarded for four years. So, of course, they weren't addressing sensory deficits. But apparently she was making sufficient progress. Well, that's a conclusion, sufficient progress. However. Well, they changed the. It came to a point where they actually changed it. Went from mental retardation. Tell me what. OHI. To other health. Well, I admit that they did that. The point is, at the IEP meeting, can the district say to the parents at an IEP meeting, we're not going to do these things. And then at the hearing, when the parents challenged that decision, can the district, school district say, well, we did those things. We didn't tell you we were doing them, but we did them. So you're saying. So your argument is, is that once they take whatever position they take at the IEP meeting, they have to stick with it explicitly. Well, explicitly, no. The IEP can always be amended. What was the purpose of the hearing? It was. How long was the hearing? Hearing was essentially four days. There was argument on the fifth day. Albert, what period of time did it expand? Four days. Just four days? Just four days. And then I think there was a little short break, and then we came back from closing argument. And three and a half days. Now, when all this occurred at the time of the hearing, did you say anything? Did you object? Did you ask for, send it back to the school district for a new IEP? Well, by that time, the student had already been withdrawn. So at that point, there's no point in going back to the district. At the hearing, until we. I mean, were you shocked? You sound like you were shocked that the district took this position. Yes. And what did you do in response to that? Well, we argued that that was. Did you say we need to put more evidence on it? We need to do this? Here's our remedy? Here's the remedy that we want? The school district psychologist, case manager, adaptive PE, and by statements, the occupational therapist, before he actually testified, testified that the district's IEP was not intended to, and was not addressing sensory needs. And their reason was because it wasn't affecting education. So the whole case was spent proving that it did affect education. The district admitted this on the last day. We shrugged and said, that's great. They just admitted our case. But then the occupational therapist said, yes, but the reading goals address sensory. The reading goals were never discussed in relation to sensory at the IEP. He says the adaptive PE goals address sensory. The adaptive PE teacher said, I wasn't addressing sensory. He said that the writing goal addressed sensory. These things were never discussed at the IEP meeting. The parents left that IEP meeting believing, because the district told them, that their child's sensory needs were not going to be addressed. Now, if this is a case where the blind squirrel finds the nut and they happen to have gotten it right, either that or they were lying to the parents, which I don't believe, maybe there were things that were put in there which, in hindsight, addressed the need. But this Court has said you don't look at an IEP in hindsight. Well, so let me be sure I understand your argument. So as a result of the position that was taken in the IEP, you withdrew the child, or your clients withdrew the child from the public school and made an independent private placement. Correct. And is your argument that that was your prejudice, that that's the prejudice, and that you were proved right? The fact that it turns out that they could say, well, reading also did this, is your argument that once they said they didn't recognize these sensory deficits as affecting their education, that that was sort of the end and you were justified in a private placement? Well, the Supreme Court says that if the district denies state, the parents have the right to place privately. And this Court has said in ML that if, and other cases, if there is a procedural defect in the two-prong analysis of an IEP, the first being was it done properly, the second analysis being is the IEP substantively appropriate, the first thing that is supposed to be analyzed was did they do it correctly. And if they didn't do it correctly, you don't even reach the question of substantive compliance. So, for example, if there was no IEP meeting and we filed due process and we alleged no IEP meeting was held, and we put it on and the district admits, yep, no IEP meeting. And then the last day of the hearing says, oh, but, Your Honor, we introduced, we created this IEP document on our own. Parents don't even have to respond to that. That is so obviously a procedural denial of the parents' right to participate in the IEP process that the hearing officer would laugh any district out of the court. And the hearing officer is. So your argument is, I gather, then, that because they changed, the district changed its position at the administrative hearing, that that rendered the original IEP or these IEPs that they had effective. Is that the argument? No. The argument is that we did not have an opportunity to participate in the IEP that they asked the hearing officer to review, the effect of the IEP. We certainly had an opportunity to participate in the preparation of math goals and reading goals, but those were never presented to us as meeting the child's sensory needs. What you're saying is that no matter how perfect the IEP was, because unknowingly they met all these needs, the parents had a right to place the child in a private school because they were told the sensory needs would not be met. Is that that? Is that the argument? Not only am I saying it, Your Honor said it. That's what this Court has consistently held, that if the procedural violations occur, you look at the procedural violations and you judge them against two standards. You're talking procedural violations. The question is, is that it's just sort of plain English. The prejudice? The prejudice. In other words, are you saying that because you had an ample opportunity to make your sensory perception, a sensory deficit argument at the board meeting when they were planning the IEP, is what you're saying is that once they said that, in effect, these sensory deficits do not manifest themselves at school and affect their educational process, that you were right, in effect, to take the child and have a private placement because they were not addressing the sensory needs? They believed, based on what they told us, that they were not addressing the sensory deficits. And that gave you the – and that by itself – I'm not asking this in a hostile way. I just want to understand your argument. And that by itself provided you with a sufficient basis to say, well, they're not addressing my child's needs. They refused to recognize the sensory deficit as a predicate for addressing goals and how to deal with it. So if they're not going to do that, I'm going to place my child in a private placement. That's certainly what happened. And you take – I mean, this business about placing kids in a unilateral withdrawal, the parents take a risk that they could lose and they don't get any money back. So there's a real deterrent to actually doing that. So what you're saying is that in reliance on what they said, you did a private placement, and then they come back at the hearing and they acknowledge, in effect, that they should have said that. They should have addressed it in the IEP. Absolutely. Explicitly. Was there any obligation on the parents' part to say, we think that if you would do X, Y, and Z, that would meet the sensory needs? Well, is there an obligation? Certainly the parents have the right to participate. In this case, they certainly did. They brought their experts to the IEP and they made suggestions. And there was what's called a resolution session. It's a settlement conference after the due process is filed where the parties sit down and see if they can resolve it. The district continued to take the position, we don't see any effect, and therefore we're not going to address the sensory. But they denied specific things that the parents thought would meet those needs? I'm not even sure the parents at that point had specifics in mind because they had not retained their own occupational therapist at the time of the IEP meeting. They had retained a speech-language pathologist and a physical therapist. But I don't believe – oh, there was an OT. Excuse me, I take that back. There was an OT who said that there was effect. Your time is running out. Yes. I'll give you a minute to reply. Thank you. Can I ask a question just out of curiosity because I don't want to interrupt you? How much money is at stake here? Well, there's a few months of placement and a unilateral placement, so probably $30,000, $40,000, I would guess, plus attorney's fees. Your counsel would just state your appearance for that? Yes, Amy Levine, appearing for San Diego Unified School District. Have you ever tried to settle this case? Yes. Yes, we have. The first issue that the court really needs to deal with here today is whether it even has jurisdiction to hear these procedural arguments on appeal. The family has attempted to create this error that the ALJ made and that the district court made by neglecting to consider prong one of the Rowley analysis, by saying that they ignored these clear procedural violations that were raised. The fact is that the family never raised these issues below, and we all know that you can't raise an argument for the first time on appeal, and even more so in an IDA case where there's a statutory requirement to exhaust administrative remedies, which is a jurisdictional requirement. Here we have the procedural error occurred at the result of the position the district took at the administrative hearing that manifested the procedural error in the way in which the IEP actually took place. That is, the parents didn't get to really participate. Well, it's not really clear what the procedural violation is that they're alleging, but I think that that is one of the things that they are now claiming, and if there was something that was a defect that occurred at the hearing, and it occurred during the testimony, then certainly there was an opportunity for cross-examination. Certainly there was an opportunity for rebuttal. There was closing argument. There was an opportunity to ask the ALJ to amend issues. There was never a mention of it in the federal complaint that was filed. The federal complaint says that it was... So can you tell when this issue occurred at the hearing, what happened? Well, I wasn't at the hearing, but... But did you read the transcript? Yeah. So what happened at the end, when this all occurred at the end, on the last day of the hearing? Well, nothing. There wasn't any objection made at that point that there was a change in position, and, in fact, there wasn't a change in position. I mean, this is something that's being manufactured. Explain that. Why wasn't there a change in position, as counsel just vigorously argued? Well, because the district had always contended that they were addressing sensory needs. They were addressing the sensory needs that were educationally related. The parents had brought these issues to their attention beginning in August of 2006. The parents said, I think there's some sensory issues. I'd like to have a meeting. They then went along and had four meetings and discussed sensory issues, conducted a full-blown set of assessments, looked at the... Part of the assessment was the occupational therapist. Part of it was the adaptive PE teacher. And then there were other assessors as well. They all looked at issues of attention. They all looked at issues of focus. There was a part of the assessment that was labeled sensory, sensory motor skills. Did the school district say, we don't think there are sensory deficits, so we're not going to address it? No. They never said that there were no sensory deficits and they're not going to address it. Basically, there was a list of things that the parents had brought to their attention. It was 16 items, things like fear of ants, doesn't like things in her hair, is afraid of washing machines, many, many things that were manifesting only at home. There was an e-mail exchange between the district's occupational therapist and the parent, and the occupational therapist said that of these things that you've listed, I see four of these as potential sensory issues. Of those... That would affect her educational development. Well, no. Four that I think would even fall within the realm of sensory. I see. One of them I've seen at school, but I don't think it's affecting her significantly because it's something that she only does when she's nervous and she's not doing it all the time. And so... These sensory deficits, I'm just curious. I mean, when you're dealing with children of this kind, is the purpose just to teach them to read or write or to ensure that in a special ed program that they're capable of sort of functioning normally in society, which involves more than just, let's say, reading, writing, and arithmetic? Right. Well, the purpose of the law is to provide an educational benefit to the student to allow them to access the curriculum. So basically the educational system is not charged with fixing the child and making them able to operate at a quote-unquote normal level, but it is to help them... make it very difficult for them to function outside of the school setting. I don't want to divert you from your argument, but I just think that there may be some sort of artificial distinction that's been drawn here. Well, no, I don't think that the district has ever said that sensory is not something that we deal with. If it affects their educational development, you would. If it interferes with learning or whatever the goals are trying to achieve through the IEP, if the sensory deficits are interfering with that, then I would think that the district has an obligation to address those in conjunction with the other elements of the plan. Right, and it's never denied that. It thinks that it has addressed it. Well, could I then... His argument seems to be, if I could use kind of an estoppel, he said that the IEP, the school board, didn't acknowledge the need to address these sensory deficits. And as a consequence, and there are no goals in the IEP, and so as a consequence of that defective, in quotes, IEP, I decided that I wanted to make a placement, a private placement at a school that would address it. And as I said earlier, this private placement is a roll of the dice for the parents in terms of there's a substantial deterrent to it because they've got to be able ultimately to prevail in this kind of proceeding in order to get reimbursement. Otherwise, they're out the money. And his argument is that it wasn't in the IEP. We went to a school that we thought would do it, and then you ultimately, on day three and a half, acknowledged that it should have been in there to begin with, and your way around your acknowledgement is to say, well, even though we didn't say anything about the sensory, the things that we gave were intended to deal with it anyway. I mean, it has some surface appeal to me. I'm just asking for an answer. It seems to me to be at least a coherent kind of argument. Well, I guess I wouldn't go that far. Well, don't go that far, but just answer. Yeah. I mean, there's no obligation for the district to sit down in an IEP meeting and label everything and say this is what we're doing for this issue, this is what we're doing for that issue, this is what we're doing for the other issue. The labels aren't important. It's what actually gets into the document. Isn't there more than that here? I mean, there are four meetings. The parents are taking the position that there are all these sensory problems, which, in effect, the board doesn't acknowledge. And so they say, well, if you're not acknowledging it and there are no goals here as to what's going to happen as a result of addressing it, I want to go someplace that will address it. Well, their procedural argument is, well, we needed to know, so then we could exercise our rights. Well, they did exercise their rights. They did go somewhere. They did file for due process. They had every right to challenge the substance of the content of the document and also the procedure. I think you really need to look at the objective evidence about what was going on and how sensory needs were addressed. We have assessments that explicitly refer to sensory needs, and so the district is aware of it and it's looking at it. We've got goals that were created that are addressing these sensory occupational therapy needs. There are adaptive PE goals that deal with bilateral coordination with motor skills. We've got occupational therapy goals that deal with handwriting and that deal with following directions. And what it kind of boils down to is that they thought we approached our goals differently than the way their experts approached the goals. Their experts wanted to look at underlying foundational skills. We were looking at skills that would actually allow the student to get her educational needs met. So it's a difference in methodology in that the district says, I'm going to look at handwriting. That's something that a student who's got motor skill issues really needs to do in order to succeed at school. Their experts say, no, we don't want a handwriting goal. We've got to look at her underlying foundational eye-hand coordination deficits when she's already in third grade. The same thing with the scissoring goals. We had in the past had a goal to help her work with cutting in school. They said, no, we wouldn't work on that. We would work on eye-hand coordination and things of that nature. And so, you know, there's a difference in approach, but that's not the same thing as not addressing the need. Let me ask you, we just got to the one thing I'd like to try and understand before you finish your argument. At the due process hearing, is that a de novo kind of thing? I mean, what's the IJ doing, the administrative law judge doing? Is he just looking to see if the IEP was adequate, meets the needs, or can he or she revise it and say, you've got to do this, you've got to do that? What's going on at the end? Well, as a remedy, they could order a revision, but only to the extent that they found that the district did not offer a free appropriate public education. So basically, the district has the initial obligation to come up with something, and it's only if the parent can prove that there was something that it denied a FAPE, then a remedy could be ordered. But the remedy might be to just send it back to the district to do it, because although the ALJ has administrative expertise, they're not in the business of running the school system. So when this issue, according to counsel, as Judge Corman said, at day three and a half of the administrative hearing, when counsel says that the district took a new position, what was available to the ALJ, assuming that that was correct? Well, it certainly could have allowed more days of hearings, certainly could have allowed rebuttal evidence, and I don't think there was any request for rebuttal evidence at that point. Once the ALJ issues the decision, is that it? Can you object to it? Can you submit the ---- There's a period that you can request a reconsideration, or I guess a clarification, I should say. Is that allowed for in the administrative regulations? Yes, and then after that, it's 90 days to appeal to federal court. Was that done here? Were there any objections to the decision? No, I don't believe so. His argument is that once you've made this concession, he wins. There's nothing more to be done. You acknowledge what you did not acknowledge in the IUP, and that's the end of the game, at least if I understand his argument correctly. What more is there to ---- What, in effect, he's saying that the judge should have said was, well, you now acknowledge that there are these sensory deficits that need to be addressed. They were not ---- there's no goals that specifically address them in the IUP. He's saying he wins. I mean, that's ---- I mean, this argument has been difficult to follow because I don't think it was that well briefed by the other side. I'm just trying to ---- Right. But the IUP did always address it. And, you know, I also wanted to mention, for example, we changed her placement. She had been in a general education placement with an aide. We changed it to a special day class, smaller class size, less distraction. So less external stimuli there. There was a classroom aide that could help her with her focus. There was an occupational therapist who was going to be consulting with the classroom teacher to work on sensory issues as well as other issues within his realm, like fine motor skills. Throughout the day, there's focus on sensory issues, on paying attention, which was basically one of her primary issues. She was getting adaptive PE. There were many, many things in this IUP that were addressing her sensory issues. And I also ---- Did the parents at that point say you also need to do X, Y, and Z or that what you were doing doesn't do it? The parents did not say that. I mean, they certainly had the opportunity to look at everything that we were offering to them. What did they say? They said we're unilaterally placing without basically further comment about that. So, you know, if they felt during the IUP meeting that there was a need to have additional goals or different goals or different services because we were not meeting the sensory needs that they said were so obvious and were brought to our attention, then they could have participated at that time. And they did participate. But there's no right to participate on drafting goals that didn't exist, which is I think what thrusted this argument. But his argument is that that was all pointless. They brought all these witnesses to say she had these sensory deficits and the board wouldn't acknowledge that they affected her educational progress. And therefore, what more was there to do if you're going to say that she doesn't have deficits, that all of these deficits they haven't noticed in school and that doesn't affect her ability to read, write, and do arithmetic? Well, I mean, two points. One is that the IUP process is not an adversarial process. It's not supposed to be anyway. And so there's not an obligation for us to put on a full defense. Families and districts are often not represented by counsel. The purpose of the hearing is to deal with fleshing out everything that was intended to be done at the IUP meeting and how it actually met the goals of the law. And that's the purpose for the hearing. And they had that right. The other thing is that the family conceded that the IUP as drafted would have provided an educational benefit to the student. And so that's the bottom line test here under the Rowley case is whether the IUP is reasonably calculated to provide an educational benefit. Well, once we've met that threshold, which they've agreed we met, then there's the rest of it is really irrelevant. There could have been more, but there's no obligation to maximize potential or to create, to put in other things that might have made it a better program. Roberts. You're over your time. Okay. Thank you. Thank you. You have one minute. One minute. Your Honor asked about prejudice. Yes, there's a prejudice that the parents placed privately. The also prejudice was that that which the district offered would have been provided in substantial part by Tracy Kababa, who admitted she didn't know anything about it and was not intended to do it. So there was prejudice that what they later said would have done it would not have done it. The district, in response to Your Honor, we actually did make suggestions. The parents were paying for private occupational therapy to address these sensory needs, wanted the district to do those things. The district declined. So there was a suggestion of what the district could have done. But the district, as Your Honor pointed out, said we're not going to do anything. So there was no point in going further. They could decline if these would not advance the educational goals. Is that correct? Could decline. I'm not sure. They said they were not going to do them. And they could do that if, in fact, what you wanted done did not advance the educational goals. It might have advanced other goals to help the child, but not to get your education. When you say these, the parents did not specifically request that certain therapies be done. They said something has to be done to address sensory needs because they are affecting education. The district declined to do anything because they said that they were not affecting education. The issue that they say we did not raise only came into being when the hearing officer allowed the IEP document to morph into something that the district had said it was not going to be when it was defined as the IEP. Thank you. Thank you for your arguments in this case. Thank you for your arguments in this case. The matter is submitted and the court is going to take a short ten-minute recess. All rise.
judges: Korman, Fletcher B. , Paez